### F. N. BURT CO., Limited, v. W. C. RITCHIE & CO.

(District Court, E. D. New York. July 6, 1918.)

1. PATENTS ⟾165—CLAIMS—CONSTRUCTION.

Broad claims will not be held invalid, if they are plainly intended to include by reference such specific limitations as would make the invention patentable.

2. PATENTS ⟾112(3)—VALIDITY—PRESUMPTION.

A patent is prima facie valid, and an inventor is presumed to be claiming a valid patent.

3. PATENTS ⟾234—INFRINGEMENT—WHAT CONSTITUTES.

Devices not described, but plainly within the concept in so far as it is patentable and is defined in the claims, infringe the patent.

4. PATENTS ⟾177—CLAIMS—VALIDITY.

A patentee cannot claim as invention a combination that has nothing whatever to do with the purposes of the device, unless the patentee uses some clear language making the extraneous combination applicable.

5. PATENTS ⟾26(1)—VALIDITY—SCOPE.

A patentee cannot patent a combination of device and material upon which the device works, nor limit other persons from using similar material by claiming a device patent.

6. PATENTS ⟾173—"PIONEER PATENTS"—WHAT ARE.

A "pioneer patent" is one which meets an old or plainly recognized want by an entirely new method of approach.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Pioneer.]

7. PATENTS ⟾173—CONSTRUCTION—SCOPE.

A machine patent, to be broad enough to cover every method of approaching a desired result, must be basic or pioneer, in such a way as to monopolize, not only the particular method, but any method making use of equivalents.

8. PATENTS ⟾227—INFRINGEMENT—INTENT.

Where defendant's machine did not infringe plaintiff's patent, it is immaterial whether defendant's machines were built deliberately to avoid infringement. or whether by accident a machine was developed along lines which did not infringe.

---

⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

9. Patents ⬅⮞328—Construction—Infringement.

Holly patent, No. 1,158,211, for a machine for making boxes of paper, or other material, in which the head and flange are connected by a binder which is adhesively connected with these parts, *held* not infringed by defendant's machine for making such boxes, the claims of the Holly machine as construed in view of the prior art, not extending to defendant's device, and the products of the two machines not being interchangeable, so as to demonstrate infringement.

In Equity. Suit by the F. N. Burt Company, Limited, against W. C. Ritchie & Co. Decree for defendant.

Duell, Warfield & Duell, of New York City (C. H. Duell, F. P. Warfield, and J. W. Anderson, all of New York City, of counsel), for plaintiff.

Walter M. Fuller, of Chicago, Ill. (Livingston Gifford, of New York City, of counsel), for defendant.

CHATFIELD, District Judge. Action is brought for infringement of the patent issued to Carlos Holly, No. 1,158,211, of October 26, 1915, on application filed April 24, 1909. The invention covered by this patent "relates to a machine for making boxes of paper or similar material in which the head and flange are connected by a binder which is adhesively connected with these parts."

The object of the invention is stated to be "the production of a machine for making boxes of this character more expeditiously, at less cost, and more perfectly" than with the machines of the prior art. The issue as tried depends to a large extent upon the limitation suggested by the statement that the machine in question is to make boxes with a "head" or bottom and a "flange"; that is, the four sides. In other words, the patent describes what is called throughout the testimony a "tray," while the defendant's infringement consists in using a machine for the making of "necks" or "collars" corresponding roughly to the flange portion of the box described in the Holly patent.

The Holly patent consists of 59 printed pages and 26 pages of drawings. The claims of the patent are 282 in number, and of these 17 are relied on in this suit. These claims are Nos. 224, 225, 250, 252, 254, 256, 257, 258, 259, 260, 261, 262, 264, 265, 266, 268, and 269. It is shown by the testimony that the demand for quantities of small pasteboard boxes increased enormously in the first few years of the twentieth century, and particularly because the use of millions of such boxes followed the introduction and consumption of Turkish tobacco cigarettes. The prior art included hat or band boxes, pill boxes, match boxes, and similar containers for small articles, but the cigarette box is now, and has been since the date referred to, the most numerous example of this form of manufacture.

No serious issue is raised over the charge of infringement, when the patent is considered solely from the language of the claims; that is, when viewed apart from the alleged limitations ascribed by the defense to the specifications and drawings in connection with the state of the prior art. There is also no question raised that the patent in

suit describes a meritorious and novel invention. The issue is sharply drawn upon direct comparison of the mechanical processes of the plaintiff's and defendant's machines, and the proof is directed to an attempt on the part of the plaintiff to show that both forms of machine are but embodiments of a basic or pioneer patent, described in the Holly specifications and stated in the Holly claims; while the defendant contends that the plaintiff's invention must be limited to the specific or exact complete device presented by the patentee and shown in the machine used by the plaintiff, with those mechanical equivalents suggested thereby, and by the specifications and claims of the patent, when construed strictly with reference to that particular form of machine.

The defendant charges, generally, that in order to obtain the benefits of a method patent, or the benefits of a machine patent so broad as to include all devices which would carry out the method of operation, the plaintiff omits from the several claims those words which specify and define, by reference, the particular machine or arrangement of operative devices which the plaintiff had in mind and disclosed as his invention. Broadly stated, the defendant contends that the plaintiff was patenting the exact machine described in the words which have been quoted; that is, a machine which would make boxes, or rather, that part of a box, consisting of a flange and a head, connected with an adhesive binder.

But the defendant does not rest here; it also contends that the plaintiff was limited by the prior art to a particular combination, which narrowed the scope of the invention and the possible meaning of the claims, even though the language of the claims, when viewed apart from the prior art, and apart from the drawings and specifications, would include any such machine as that of the defendant. It goes without saying that the particular claims in suit can be read upon the defendant's machine without difficulty, if the reference to the specifications and to the particular type of machine there described be treated as illustrative only; that is, as descriptive of a preferential use or a typical instance. These claims also can plainly be read on the defendant's machine, if the invention is not limited by the prior art to the narrower application or embodiment which the defendant claims was approved by the Patent Office, when allowing the language of the claims as issued.

The claims have been divided by the experts into four classes, which are illustrated by the first claim of each class. These are as follows:

"224. In an apparatus of the character described, in combination, an angular former, means adapted to apply a combined body and cover blank to said former, said blank comprising spaced grooves in the body portion spanned by the cover portion, and means co-operating with said former to fold said blank at the groove portions and around said former, and cause portions of said cover to enter said grooves."

"250. In an apparatus of the character described, in combination, a plurality of web-feeding mechanisms, a plurality of mechanisms adapted to sever blanks from said webs, web-folding mechanism, means whereby the aforesaid mechanisms automatically co-operate to form a composite blank, composed of a section of one web disposed on the opposite faces of a section of another web and across one edge thereof, and mechanism adapted to fold said composite blank on lines transverse to said edge into a tubular element."

"259. In an apparatus of the character described, in combination, body web-feeding means, cover web-feeding means adapted to operate separately from the body web-feeding means, gluing means, body-web severing means, cover web-severing means adapted to operate separately from the body web-severing means, cover web-folding means, means whereby the aforesaid means automatically co-operate to form a composite blank comprising an adhesively attached superposed body blank and cover blank, with a portion of the cover blank disposed on opposite faces of the body blank and around one of the edges thereof, an angular former, and means adapted to co-operate with said former to fold said composite blank in a plane parallel to said edge, around which said portion of the cover blank is disposed, into a tubular element."

"266. In an apparatus of the character described, in combination, feeding mechanism comprising devices adapted to separately feed a pair of webs, blank folding mechanism comprising a former, severing mechanisms, one for each web, and means whereby said feeding and severing mechanisms operate to successively produce pairs of superposed blanks from said respective webs; the blanks of a pair being of different length in that dimension corresponding to the length of the webs from which they were produced, respectively, and one of said feeding mechanisms comprising means operative intermediate said severing mechanism and said folding mechanism adapted to successively transfer the blank pairs into co-operative relation with said folding mechanism."

Another feature of the defense is that the patent in the prior art which is most strongly relied upon, viz., the Keunen et al. (British) patent, No. 15,063 of 1895, is designed (like the Holly patent in suit) to make "trays" (that is, the part of boxes having a bottom or head), and not the flange or collar, which the defendant is manufacturing, and which is claimed by the plaintiff infringes its patent. This Keunen et al. (British) patent was not planned exclusively to make pasteboard boxes, but described also the small, thin veneer boxes familiarly known by their use for containing Swedish matches; and the defendant contends that this machine is the basis of the defendant's plan of device for the making of "collars" (or bottomless trays), called also "flanges" and "necks" in the art.

It will be noted that, if the defendant can closely ally its machine with the box-making machines of the Keunen patent, and if the Keunen (British) patent is the nearest prior art from which the plaintiff proceeded by certain improvements to successfully make pasteboard cigarette boxes, then the defendant must show that the various improvements and changes made by the plaintiff over the Keunen (British) patent, were but adaptations of well-known ideas, and must thereby limit the plaintiff's invention to the mere assemblage or combination of these ideas in a particular machine, or the defendant must show that the devices used by it, in accomplishing substantially the same results or operations, are not mechanical equivalents for those described by the plaintiff. The practical application of this last proposition is that the defendant cannot escape the charge of infringement by a showing that the improvements which it has made over the Keunen (British) machine are in fact used in making a collar, and that the defendant does not go so far as to insert a bottom in the collar. Nor can the defendant escape the charge of infringement by finding each of these improvements, and each of the plaintiff's improvements, in some device of the prior art, where its use was merely similar in function, but from which the idea of its utilization for the purpose would require

more than a mere mechanical application. It is evident, therefore, from a consideration of the machines and of the prior art, that the defendant must admit the charge of infringement, unless the features of the machines entering into this appearance of infringement can be shown to be open to the defendant, and unless, by going to the roots of the scope of the invention, the meaning of the claims in so far as they can be held valid can be limited.

[1] It is unnecessary to do more than refer to the proposition that the claims must be so interpreted as to give them a valid meaning, if possible, and that, if they would be rendered invalid by an interpretation so broad as to cover the defendant's structure, it is to be presumed that the plaintiff, in using the language which he put in the claims and which was allowed by the Patent Office, was describing that which can be held patentable; in other words, that the claims must be limited to the patentable invention, even though reference to the specifications, drawings, and prior art is had, in order to learn the limitations referred to. The courts have settled the proposition that broad claims will not be held invalid, if they are plainly intended to include by reference such specific limitations as would make the invention patentable. Hobbs v. Beach, 180 U. S. 400, 21 Sup. Ct. 409, 45 L. Ed. 586; Outlook Env. Co. et al. v. General Paper Goods Mfg. Co. et al., 239 Fed. 877, 153 C. C. A. 5.

[2, 3] A patent is prima facie valid, and an inventor is presumed by the courts to be claiming a valid patent, rather than to be endeavoring to do wrong by claiming what does not belong to him, under the guise of general language. The inventor is seeking to include all that can legally be covered by that which he describes as his invention, and is limited only by the prior art, within the boundaries of that which can be said to have reasonably been intended, and to have been set forth or disclosed by the words of description which the inventor has chosen.

[4-9] Thus devices, not described, but plainly within the concept, in so far as it is patentable and is defined in the claims, infringe the patent, and, for that very reason, if earlier, would have taught the same principle with a similar application, and would thus have constituted an anticipation if properly claimed. In deciding this case, therefore, we must proceed to the consideration of the prior art, in order to understand what the plaintiff was inventing, and what the defendant was using in its own device.

Cigarette boxes had been made by so-called pony machines, or hand machines, in which a revolving holder was turned by hand in order to cover the collar or flange with the adhesive strip of glazed paper, desired to furnish a smooth surface, to join the ends of the flange together, and to hold the box in shape. The prior art shows, in the making of boxes, the use of a cut partially through a pasteboard surface in order to bend it into a square corner. Beecher, No. 186,978, February 6, 1877; Newton & Beecher, No. 322,470, July 21, 1885; Gay, No. 645,950, March 27, 1900. The prior art shows, also, the use of glazed adhesive paper bindings to hold the bottom of a box

251 F.—58

in place and to hold the parts when assembled to the precise dimensions and angles desired.

The prior art showed in many patents the application of what is admittedly, in the general sense, an equivalent idea for a supply of paper or pasteboard or wooden veneer parts. These may be furnished by hand, having been severed or prepared in advance, fed from a source of supply by individual feeding device, or from a hopper by gravity, or cut from a strip fed in the direction of its length or unrolled. See Gay, No. 645,950, March 27, 1900; Oesterreich, No. 815,-626, March 20, 1906. The prior art shows as equivalents the idea of feeding such blanks, so as to advance them sidewise or endwise after severing from a roll, and it is evidently old in the art to make the width of the roll equal to the length of blank desired, or to cut off the roll at the required place, whether the length or the width is the measure of the blank desired.

The patent in suit involves so many mechanical parts that it is impossible to refer to them in detail, but no separable unit or combination of parts, which performs one specific movement or operation, is new, nor is any one of these applications difficult of conception, from the standpoint of providing the next step in a mechanical construction, after the general idea has been presented, and after the end desired has been plainly understood. The machines involved in this case are intricate in detail and almost intelligently operative in their movements; but this is because of the association of many parts, so adjusted and arranged as to carry on, one after the other, the succession of steps which the inventor knew was necessary, and which would be obvious to any one undertaking to produce the same result.

Cigarette boxes were not a new product. None of the features of the cigarette box were new in design, and the completed box was the same as a box made by hand, so far as the arrangement and relations of the parts are concerned. The invention, therefore, of the plaintiff, lies in the combination of ordinary and old ideas, in one machine, which shall exactly and uniformly repeat the same steps automatically at the precise time when those steps would be needed to make the next following box, and to do this rapidly and without waste of material or likelihood of stoppage for mechanical adjustment or cleaning.

But the problem was understood by Keunen who says (Keunen patent, No. 15,063, p. 1, lines 9 to 23, inclusive):

"The said invention comprises an improved machine wherein the boxes are formed by means of a stationary pattern block, or former, around which the material whereof the boxes are to be made is placed and fixed in the required shape by means of paste. In the machines hitherto employed for making boxes of the kind or class referred to, it has been usual to cause the strip of wood or other material, of which the boxes are to be constructed, to travel around a disc or plate; and in the successive stages of the operation, the strip of wood or paper was first bent, so as to form the sides and corners of the box; then the bottom piece was applied to the side walls; these were next pasted at the joint or seam; and lastly the bottom was fixed to the body of the case or box—all of which operations were performed whilst the disc was rotating. Moreover, in some of the old machines, blocks or formers have been made to

reciprocate and revolve at the same time; the several operations above mentioned being performed during such movements of the block or former."

The first step in which the plaintiff departed from the usual method was to furnish his blank pasteboard with plowed-out scores or grooves, in the place of cuts partly through the substance. The advantage from this was not in the mere mechanical superiority of a groove over a cut in bending the corner into form, but the plaintiff thereby secured room for the insertion of the covering paper into the corner, in such a way as to hold the corner at a right angle, and to affix the paper smoothly, although the part folded over into the inner side was as long as the paper upon the outer side of the corner. This evidently allowed the use of a continuous strip, to be folded and pasted on the inside and the outside of the edge, without cutting the inner surface. He thus avoided a bulging or folded corner when pasted down.

Several patents show the use of cuts called "scores," but Holly separated the knives making the cut, and planed out the material between the cuts, thus making a groove, which has been treated as an essential element throughout the case. But he did not attempt to patent the use of such a groove, nor of the device for making it. Nor did he attempt to patent a box-making machine with such grooves, but merely one with "means for scoring, scarfing, and trimming said web" (claims 176 to 181).

The next step in which the inventor departed from the prior art was to bevel or "scarf" the ends at the place of junction, and to make this joint in the middle—that is, away from the corner—of one of the sides. This of itself was well known in many arts, particularly in any application of the ideas of woodworking or box making. By combining this kind of a joint with a paper binder shorter than the pasteboard strip, and so placed that the ends of the paper binder fell on each side of the joint, the plaintiff made it possible to fold the paper binder over the edge, and down the inside and outside surface of the flange, and then to continue this folding around onto the bottom of the box, in a manner which would be impossible by one series of rotations, if the paper-binding strip were applied in the old hand method of following the perimeter of the box as it revolved about an axis vertical to the bottom at its center. In this way the plaintiff was able to use the turret construction which was old in the art (Loyens & Paulson, No. 556,997, March 24, 1896), and to revolve a series of boxes around an axis parallel to the plane of the bottom of the box, and thus also to allow the insertion of the bottom into the flange at the proper point in the rotation of the turret, without interfering with the use of that rotation to complete the folding over of the adhesive paper strip.

Holly folded one edge of his paper strip over the pasteboard strip before cutting off the pasteboard web, and thus formed a composite blank, which he advanced in rotation in a sidewise direction; whereas, in the prior art, or in the hand machine, these strips advanced in rotation, in an endwise direction. The Hallock patent, No. 569,496, has a composite blank; but this is rotated endwise, and is not folded. To feed the paper strip and the pasteboard strip from two rolls running

on parallel axes is evidently equivalent to feeding them from axes vertical to each other. If these axes are parallel to each other, the strips can be brought in contact in a position where they can immediately proceed into revolution around the turret, as soon as severed, and the axis of rotation of the turret may also be parallel to the axle of the rolls from which the paper and pasteboard are fed. If the axis or axle of the roll of the paper web is perpendicular to that of the axis or axle of the pasteboard web, then, after severance, the rotation of the composite blank would be parallel to one or the other of the axles of these rolls, but would be perpendicular or vertical to the axle of the other roll.

But the plaintiff made use of this in order to save the use of mechanical parts. He feeds these two webs sidewise from parallel axles, and obtains a strip of adhesive paper wider than the strip of pasteboard web, by severing the pasteboard web first, then, through the use of grippers, drawing the paper web and the pasteboard web away from the pasteboard roll, so as to sever the paper in the space thus created. He then continues the movement sidewise without the use of a mechanism to change its direction of progression; in other words, the composite blank can then proceed to rotate, without a longitudinal shifting to another part of the machine.

The defendant, on the other hand, makes use of a longitudinal shifting of the two blanks (adhering to each other, but with no part of the binder folded over) by the insertion of a finger, which comes in contact with the pasteboard web alone. This is made possible by so placing the paper web and so adjusting its width that it does not entirely cover the outside of the flange; that is, after being severed, the pasteboard strip is wider than the paper strip and extends beyond the surface covered by the glazed paper. This uncovered portion is inserted in the tray or half box, and the uncovered portion is concealed from sight by the sides of the box itself.

The plaintiff thus simplified his machine, in order to meet the requirement of entirely covering the side of the box with paper, and to have this paper serve an additional function by being folded over the bottom, as was well known in the prior art, in order to hold the bottom in place and to make the entire box rigid. If this additional feature of fastening in the bottom was not necessary, as if the structure was intended to be a mere collar or neck without a bottom, some change in the device for severing the paper web must necessarily have been made, so that the paper web, when pulled by the grippers beyond the width of the pasteboard flange, could be severed at such a point as to leave no extending or protruding rim or surface to be folded around the bottom, or the bottom edge of the flange.

During the trial the plaintiff's mechanical expert succeeded in making an arrangement of the plaintiff's machine by which this severance could be obtained, and through this means succeeded in making necks upon one of the plaintiff's machines. From this it was argued that the invention of the plaintiff included, as a mere mechanical equivalent, the use of the plaintiff's device for this purpose. Whether or not this change, of itself, involved invention, is aside from the issue in the

case, inasmuch as the plaintiff was not seeking to construct a machine for the making of necks alone, and was describing an invention, as he expressly stated in his claims, which would make possible the complete formation of a box (that is, the sides and bottom of a box, or the sides and cover of a box, as the case may be) in which the adhesive paper strip could be used for securing the bottom blank to the flange.

The defendant's machine cannot be used for the application of the paper adhesive strip, so as to completely cover the outer surface of the flange, without the addition of some other method of advancing the composite blank, for the finger used by the defendant for this purpose must either perforate the paper blank, or must depend upon frictional contact alone in order to move the composite blank, unless that finger can be brought into contact with the pasteboard blank itself.

This brings in the method of joining the ends of the pasteboard and paper blanks made use of by the defendant. Instead of making the joint of the flange intermediate between two corners, he forms a butt joint at the corner and bends around that corner a tab of the adhesive paper blank, which thus requires the paper blank to be longer than the pasteboard blank. He severs the paper blank, so as to produce this necessary length, by feeding it longitudinally into contact with the pasteboard blank and by severing it after the finger has moved the pasteboard blank away from the roll. He hems over the paper on a part of one side during this motion, and by using a narrow strip of paper fed lengthwise avoids the necessity of cutting the paper blank when in contact with the pasteboard blank, as would be necessary if the paper blank were fed sidewise upon the pasteboard blank, and if the composite blank were moved sidewise as in the plaintiff's machine, so as to leave the paper blank, after cutting, narrower than the pasteboard blank, after cutting.

The problem is therefore to determine whether the plaintiff expressly limited himself to a feeding of the paper roll and the pasteboard roll in the same direction, that is, so that both blanks would be presented sidewise, with a differential feed to give the requisite width of paper, and whether he thus intentionally deprived himself of claiming a structure in which one blank should be fed lengthwise, whether or no the composite blank should thereafter be moved sidewise, to proceed into the rotation for the necessary folding. There are many minor details involved in this general question, but it must be held upon the entire case that the plaintiff did have in mind the form of device in which he might use the advantages derived from feeding both blanks so as to present them sidewise, and that he required in so doing the forming of a composite blank before severing the paper blank.

The state of the prior art, particularly of the Keunen type of machines, bears out this contention. In fact, the defendant's machine follows much more closely the ideas of the Keunen patents than those worked out in the particular claims of the plaintiff's patent as to which infringement is charged. It will be noted that this patent was over six years in the Patent Office, and that the defendant's machine was in use and its general design known to the plaintiff long before the plaintiff's claims were finally allowed. It is argued from this that the plaintiff

has sought to so word the claims that they would cover the defendant's construction, and that they do not properly describe the plaintiff's invention. It is pointed out that claims 261 to 265 state the severing of a blank from the body web and the adhesion of this blank to the covering web, whereas in the machine of the patent in suit the two blanks are made into one strip and then each blank is severed at a different point. But in the Keunen and in the defendant's machine the body blank, after being severed, is applied to the covering web, and then the covering web is drawn to the place where it in turn is to be severed.

Claim 265 describes a blank pressing means. In this sense, also, the word "blank" more aptly fits the defendant's appliance, while the plaintiff's machine presses the web before the blanks are severed. These examples show the breadth of the claims which the plaintiff seeks to support by the invention disclosed in his patent. If the plaintiff's machine be taken as the complete expotheosis of his invention, then these claims would be plainly invalid in so far as they are expressed in broad language, covering devices and ideas shown in the prior art, and not merely mechanical equivalents of some element in the plaintiff's machine. Whether or not the defendant has a patentable combination makes no difference, if his combination is made up entirely of elements from the prior art, which do not infringe the plaintiff's invention as set forth in a valid reading of the plaintiff's claims. The plaintiff's claims should be so read as to render the invention valid, and not invalid; but the claims must not be rendered invalid by broadening them unduly.

The patentee cannot claim as invention a combination that has nothing whatever to do with the purposes of the device, unless the patentee uses some clear language making the extraneous combination applicable. For instance, claim 99 says:

"99. In a device of the character described, in combination, a rotary shaft carrying a blank support and a mutilated gear, a second mutilated gear meshing with the first, and a pawl operatively connected with the second gear and adapted to engage and disengage the first gear to lock the same in its periods of rest."

The description of the shaft, gears, and pawl obviously could refer to any machine. The patentee has no right to claim an invention of such a device, except as he shows patentable combination of these old elements with other elements making up a novel box-making machine.

Again, the patentee in claim 225 describes a device making use of a blank "comprising spaced grooves in the body portion, said grooves being produced by the removal of the material of the body portion of the blank." But the machine described has nothing to accomplish the removal of this material, and in fact the grooves are prepared by an entirely different mechanism. The patentee cannot patent a combination of device and material upon which the device works, nor limit other persons from the use of similar material by claiming a device patent. Morgan Env. Co. v. Albany Paper Co., 152 U. S. 425, 14 Sup. Ct. 627, 38 L. Ed. 500; American Tob. Co. v. Streat, 83 Fed. 700, 28 C. C. A. 18; Union Paper Bag Mach. Co. v. Advance Bag Co., 194 Fed. 126, 114 C. C. A. 204.

In fact, the patentee states in claim 252 that his folding mechanism is so designed as to enter "into the grooves of the folded blank"; but it does not in fact do so, and, on the contrary, merely squeezes or forces the cover paper into the grooves, and there is nothing in the device itself which shows patentable invention because of larger or smaller grooves. The advantage of the large grooves, in presenting a smoother surface, is a matter of commercial competition rather than of invention, and certainly cannot be one of the mechanical parts of the machine itself.

Thus many claims of this patent might be attacked successfully, unless the patent is limited to the actual mechanical combination of the plaintiff's machine and its equivalents. But it is not a pioneer or basic patent. It was successful because it met a new demand by improving on old lines. A pioneer patent is one which meets an old or plainly recognized want by an entirely new method of approach. Morley Machine Co. v. Lancaster, 129 U. S. 286, 9 Sup. Ct. 299, 32 L. Ed. 715.

The defendant's machine follows so plainly the Keunen machine that mention must be made of the many objections raised by the plaintiff's expert to support his contention that the Keunen (British) patent is invalid. It appears that the Keunen machine was patented in Germany, No. 90,155 of 1895, to Jagenberg, in France, No. 249,402 of August 5, 1895, in England, No. 15,063 of 1895, in the United States, No. 608,201 of August 2, 1898, and in Belgium, No. 116,951 of 1895.

The patent describing the English machine was taken by the defendant's expert as best illustrating the particular points on which defendant relied. All of these patents have been published in this country, and a catalogue was introduced showing the manufacture and sale of a machine identified by one of the witnesses as corresponding to the Keunen-Jagenberg German patent, and also testified by one of the machinists to be an illustration of machines imported into this country and used here in the manufacture of cigarette boxes, for a considerable period before the date of the Holly invention.

Objection was made to this catalogue on the ground that it was not sufficiently proven as a publication of the prior art, and that it did not show in detail the machine of the Keunen invention. In connection with the oral testimony of the witnesses, it will be held that this catalogue is competent to the extent of showing what it does show, and the picture and text are certainly corroboration of the oral testimony of the witnesses that a machine of this general type, built along the lines of the Keunen patents, was in practical use and not unworkable.

The plaintiff's expert has enumerated a number of defects in the Keunen (British) patent which he says would prevent successful working of the machine as described in the patent. A model which was introduced in evidence in the case has overcome some of the defects, others could be corrected by ordinary mechanical skill, and the most serious objection, viz., that the machine would become gummed up and not work successfully, is answered by the testimony of the witnesses and the evidence of the catalogue that such machines have operated and manufactured boxes in commercial quantities.

But, even considering that the Keunen machine, as described in the

paper patent, may have such defects and be so different from the machine which is practically workable as placed on the market, it must be held that sufficient evidence has been shown of the existence in the prior art of machines built upon the ideas presented in the Keunen patents, and modified or improved so as to avoid the defects pointed out by the plaintiff, that the defendant would have the right to rely upon the practical application of these ideas, in interpreting and seeking to avoid infringement, when constructing a machine with knowledge of the specifications, drawings and claims of the Holly patent.

Paper boxes were, of course, old in the art, and cigarette boxes, with necks or flanges, covered with glazed paper, and having the strips of glazed paper so folded and pasted as to bind together the sides and bottoms (or the flange) and also to make a smooth edge and surface, were unpatentable. Folding machines, to simplify the hand operations, and to take the place of hand operators, were known. The defendant and the tobacco companies had so-called "pony" box machines in use. The machine claimed to be an infringement in the present case was manufactured from suggestions by Mr. Stock, the mechanical superintendent of the defendant's factory, after making a so-called Traver necking machine at the factory. One Telfair, who later patented the Telfair machine, No. 1,054,473, on an application filed March 7, 1910, had been building a box machine for the defendant. All were trying to extend the operations by machine to the point where the process could fairly be called automatic; that is, where blank material, in quantity, could be fed into the machine, and, by merely seeing that the machine pursued its functions properly, completed articles would be ejected from the machine when the process was complete.

In this sense, the defendant's machine is automatic, as is also that of the plaintiff. It is unnecessary to describe, more than by comment, the evident ways in which, for instance, a supply of blanks could be introduced in place of a roll of web, or in which the scoring or scarfing of the web may be done as the pasteboard is supplied, or before that time in some other place, to avoid the collection of dust. Such substitutions or changes do not affect the automatic character of the machines in question. But the Holly machine, as described in the patent, is an automatic machine, planned to make, simply, rapidly, and carefully, boxes with bottoms. The modified Holly machine, as described upon the trial, is an automatic machine for the making of necks or flanges. This may be within the language of some claims, when separated from the specifications as a whole, and this modification may be protected by the Holly patent, without the necessity of filing an improvement patent. But that is outside of the issue.

The defendant's machine is an automatic machine for the making of necks or flanges. Because all of the parties were seeking to devise a machine which could properly be called "automatic" does not mean that the plaintiff has obtained a patent which includes all automatic machines, which will successfully avoid the necessity of hand operation or feeding, at some point in the process. This automatic feature is the ultimate purpose of the Holly invention and of the defendant's device. But if the Holly machine is limited to a successful combina-

tion of parts, performing the functions automatically by one patentable form of device, and if the same desired end is obtained by a dissimilar device, comprising different combination of ideas from the prior art, we must conclude that the claims of the Holly patent would be rendered invalid, as has been previously stated, if they were interpreted so broadly as to be equivalent to a method patent for automatically making boxes of the type or style desired. Fuller v. Yentzer, 94 U. S. 299, 24 L. Ed. 107; Corning v. Burden, 56 U. S. (15 How.) 252, 14 L. Ed. 683; Wicke v. Ostrum, 103 U. S. 461, 26 L. Ed. 409.

In fact, a machine patent, to be broad enough to cover every method of producing the desired result, must be basic or pioneer, in such a way as to monopolize, not only the particular method, but any method making use of equivalents, in particular steps and also in results, before the machine patent can be held broad enough to render all machines, which perform similar steps and produce similar results, infringements of the machine patent. Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136.

This is illustrated in this case by the testimony relating to the way in which the defendant reached the construction of its machine. According to the testimony, the president of the defendant company, a year or so before the application for the Holly patent, was at the plaintiff's factory by invitation. This was at a time when the demand for cigarette boxes began to make competition important. The plaintiff was beginning the use of the Holly machines. The defendant was a competitor, making boxes in large quantities by hand, or by the so-called pony hand machines. The plaintiff sought to discourage the defendant in its ordinary competition, and the defendant was interested in ways of successful competition. The president of the defendant, who is not a mechanic, viewed some 50 machines at the plaintiff's factory in the space of about half an hour. According to his testimony the one thing outstanding in his recollection was that the plaintiff used scoring or scarfing machines, which created a large amount of dust in preparing its rolls of blank web. But this idea of itself was not patentable. The president of the defendant company also gathered from the plaintiff's operation the idea that some automatic machine would be the only successful way of competing with the plaintiff.

Some time thereafter, by deliberate investigation according to the plaintiff's contention, or by coincidence according to the defendant's testimony, a Mr. Telfair, who must have had some knowedge of the Holly devices, undertook to build machines for the defendant, out of which the defendant's present form of machine has grown. As was ruled by the court during the course of the trial, this placed upon the defendant the responsibility of avoiding the use of the Holly ideas in any way which would infringe the Holly patents, even if the defendant had precise knowledge of the form of machines which the plaintiff was using. If the result of this knowledge on the part of the defendant had been an infringing machine, no amount of protestation by the defendant that this exact knowledge was lacking would save it from the charge of infringement. On the other hand, if the defendant's machines do not infringe, it makes no difference whether these

machines were built deliberately to avoid infringing the Holly patent, or whether by accident a machine was developed along other lines which did not infringe the Holly patent.

The issue in the case, therefore, comes down to the same proposition which has been previously considered, viz., whether the claims of the Holly patent must be necessarily so limited as to differentiate the Holly machines from the development of the prior art, in the way in which the defendant has constructed its device. As will be observed from a reading of the claims, most of these claims begin with the words, "In an apparatus of the character described, in combination." If these words mean merely, "In any machine designed to automatically construct pasteboard boxes, or the flanges for pasteboard boxes, from supplies of cardboard and a supply of covering paper, with the use of adhesive material as a means of fastening," then the language of the claims is sufficiently broad to give the plaintiff a basic or pioneer patent covering all machines having means or devices for performing the various steps described generally in the several claims. But such a broad construction is impossible, when the prior art and the specifications of the patent, as illustrated by the drawings, are taken into account. The Holly patent must be limited to that form of automatic machine which embodies and is dependent upon those general ideas of construction which have been particularly referred to previously in this opinion.

Thus limited, the Holly patent does not include the defendant's machine, in which the flange or neck portion of the cigarette box is folded up by the lengthwise movement of a strip which has the covering paper applied to a part only of the outside surface. In this view of the Holly patent, those portions of the defendant's device which would otherwise fall within the language of some of the Holly claims do not constitute infringements of the combinations described. But, going further than this, no one of the Holly claims so distinctly and broadly gives to Holly the right to monopolize any particular feature of the Holly machine as to make it patentable apart from its combination in the automatic whole of which it is an integral part. It is the application of this device to the particular need of the Holly automatic machine that is patented, rather than the use of the particular device on any automatic machine, for the general making of pasteboard boxes.

Claim 252, describing the use of the scores in the pasteboard web as recesses or chambers into which the covering paper may be actually inserted by the former, in order to make a smooth and rigid right-angled corner, presents the only feature of these Holly claims which is not dependent upon the general design of the Holly structure. The defendant's machine has a score at three corners of the neck, while the fourth corner, where a butt joint exists, necessarily allows the covering paper to be folded into the space of the joint, and thus in this respect the defendant's structure is like that of the Holly patent, both in design and in application.

If this claim of the Holly patent could be divided and held valid, in the broad sense of securing to Holly the sole right to make clean and smooth corners in this manner, the plaintiff would be entitled to a

decree upon this claim, without reference to the other claims of the patent in suit. But Holly cannot monopolize the right to form a corner by the use of the covering paper, nor can he monopolize the right to manufacture an improved corner by the use of these scorings or grooves where material has been removed, in the formation of a box or in the securing of space for the smooth and tight application of the covering paper.

The same idea is shown in the Swedish patent to Svenson, No. 255 of July 16, 1885, for the making of match boxes, and in other devices of the prior art, where wood veneer is employed. The claims of the Holly patent are in these respects valid only in so far as they utilize these ideas in the construction of the automatic combination which Holly describes, and in so far as Holly thus prevented the possibility of improvement by the addition of this feature to the other portions of his automatic machine. In so far as the defendant uses the same ideas in a different automatic machine, he is using ideas from the prior art, which he had the right to employ, if he did not thereby copy the combination of Holly in producing a machine in which these particular features were present.

With such an interpretation of the Holly claims as a whole, it becomes necessary to hold that the products of the two machines are not interchangeable; that is, that the product of the Holly machine, even if that machine be so adapted that it could make necks or flanges, is not a product which of itself proves that the machine making the product of the plaintiff is the same in patentable novelty as the machine making the product of the defendant. Hildreth v. Lauer & Suter Co. (D. C.) 204 Fed. 792. Nor are the various elements of the machines interchangeable, for they cannot be taken away from the particular combination or setting in which they are used in making up the complete automatic whole. Each particular portion or integral part of the device must be viewed from its relation with and bearing upon the other integral parts of the device, in passing upon the validity and also the scope of the claims.

From these standpoints it must be held that the Holly claims are, as substantially conceded by the defendant, valid when viewed from the standpoint of the Holly patent as a whole, and when limited to the description of an integral or separable combination, entering into the general scheme of the Holly design. But from this it must necessarily also be held that the defendant's device as a whole is not an infringement, and that the separable or integral parts of the defendant's machine, which correspond to those parts of the Holly machine which perform similar functions and which construct similar portions of the pasteboard box, are not infringements of those particular claims describing the form of device in the Holly machine by which that particular result is effected.

A decree may be entered, giving judgment to the defendant because of lack of infringement of the claims of the Holly patent in suit, when so construed as to describe patentable invention in the several parts of the Holly machine, and because of lack of infringement of those claims, when considered with reference to the validity of the Holly patent as a whole, viewed in the light of a patentable combination.